

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Richmond Division

| UNITED STATES OF AMERICA | |
|---|---|
| v. | Case No. 3:24-MJ-16 |
| MUHAMMAD PAHLAWAN, | Case No. 3:24-MJ-17 |
| MOHAMMAD MAZHAR, | Case No. 3:24-MJ-18 |
| GHUFRAN ULLAH, AND | Case No. 3:24-MJ-19 |
| IZHAR MUHAMMAD, | |
| Defendants | |

**UNITED STATES OMNIBUS MEMORANDUM IN AID OF MOTION FOR
DETENTION[1]**

In January 2024, Muhammad Pahlawan smuggled a warhead and other critical

components for medium range ballistic missiles and anti-ship cruise missiles across the Arabian

Sea.  When United States forces caught him, he refused to slow his boat and instead tried to burn

it down.  Two members of the boarding team died in the process.  Then Pahlawan lied.

Repeatedly.  And he encouraged the other thirteen members of the vessel he captained to do the

same.  Three of his crew did so: Mohammad Mazhar, Gufran Ullah, and Izhar Muhammad.  All

---

[1] Pursuant to the Court's Order dated February 23, 2024, the government intends to file this
detention memorandum in each individual case, including the four defendants' cases (Case Nos.
3:24-MJ-16 through 19) and the ten material witnesses (Case Nos. 3:24-MW-1 through 10).  The
issues of detention largely overlap across each individual case, and so the government has
presented the facts, law, and arguments in an omnibus motion for purposes of judicial economy
and efficiency.

four of these defendants have been arrested for their crimes, have immigration detainers lodged against them, and should be detained pending trial under 18 U.S.C. § 3142.

The ten remaining crewmembers have been arrested as material witnesses under 18 U.S.C. § 3144. With no connections to the United States, active immigration detainers, and unique information regarding the case in their possession, all ten material witnesses should be detained pending criminal depositions under Federal Rule of Criminal Procedure 15.

### Procedural Background

On February 11, 2024, a United States Magistrate Judge sitting in the Eastern District of Virginia, Richmond Division, signed a complaint for an arrest warrant for Muhammad Pahlawan, Mohammad Mazhar, Ghufran Ullah, and Izhar Muhammad. Pahlawan has been charged with possessing an explosive with an intent to commit maritime violence, in violation of 18 U.S.C. § 2280a(a)(1)(B)(i), and providing materially false information to federal law enforcement officers during a boarding, in violation of 18 U.S.C. § 2237(a)(2)(B). Mazhar, Ullah, and Muhammad have been charged with providing materially false information to federal law enforcement officers during a boarding, in violation of 18 U.S.C. § 2237(a)(2)(B).

Pursuant to 18 U.S.C. § 2280a(a)(1)(B)(i), except in certain circumstances,[2] it is a crime to unlawfully and intentionally "transport[][3] on board a ship— (i) any explosive[4] or radioactive

---

[2] Section 2280a(a) does not apply to "the activities of armed forces during an armed conflict, as those terms are understood under the law of war, which are governed by that law" or "activities undertaken by military forces of a state in the exercise of their official duties." 18 U.S.C. § 2280a(c).

[3] "Transport" "means to initiate, arrange or exercise effective control, including decisionmaking authority, over the movement of a person or item." 18 U.S.C. § 2280(d)(23).

[4] "Explosive material" means "explosives, blasting agents, and detonators," as well as "gunpowders, powders used for blasting, all forms of high explosives, blasting materials, fuzes (other than electric circuit breakers), detonators, and other detonating agents, smokeless

2

material, knowing that it is intended to be used to cause, or in a threat to cause, death to any person or serious injury or damage for the purpose of intimidating a population, or compelling a government or an international organization to do or to abstain from doing any act ...." 18 U.S.C. § 2280a(a)(1)(B)(i).

The conduct prohibited by § 2280a(a) is within the jurisdiction of the United States if: (1) "in the case of a covered ship,"[5] if: (a) "such activity is committed ... against or on board ... a vessel subject to the jurisdiction of the United States[6] .... at the time the prohibited activity is

---

powders, other explosive or incendiary devices within the meaning of [18 U.S.C. § 232(5)], and any chemical compounds, mechanical mixture, or device that contains any oxidizing and combustible units, or other ingredients, in such proportions, quantities, or packing that ignition by fire, by friction, by concussion, by percussion, or by detonation of the compound, mixture, or device or any part thereof may cause an explosion." 18 U.S.C. § 2280(d)(6); 18 U.S.C. § 841(c); 18 U.S.C. § 844(j). The term "explosive or incendiary device" means "(A) dynamite and all other forms of high explosives, (B) any explosive bomb, grenade, missile, or similar device, and (C) any incendiary bomb or grenade, fire bomb, or similar device, including any device which (i) consists of or includes a breakable container including a flammable liquid or compound, and a wick composed of any material which, when ignited, is capable of igniting such flammable liquid or compound, and (ii) can be carried or thrown by one individual acting alone." 18 U.S.C. § 232(5).

[5] "Covered Ship" "means a ship that is navigating or is scheduled to navigate into, through or from waters beyond the outer limit of the territorial sea of a single country or a lateral limit of that country's territorial sea with an adjacent country" (i.e., international waters). 18 U.S.C. § 2280(d)(5). In turn, "ship" "means a vessel of any type whatsoever not permanently attached to the sea-bed, including dynamically supported craft, submersibles, or any other floating craft, but does not include a warship, a ship owned or operated by a government when being used as a naval auxiliary or for customs or police purposes, or a ship which has been withdrawn from navigation or laid up." *Id.* § 2280(d)(18).

[6] A "vessel subject to the jurisdiction of the United States" includes "a vessel without nationality" and "a vessel assimilated to a vessel without nationality under paragraph (2) of article 6 of the 1958 Convention on the High Seas." 18 U.S.C. § 2280a(b)(1)(A)(i); 46 U.S.C. § 70502(c). In turn, "a vessel without nationality" includes: "(A) a vessel aboard which the master or individual in charge makes a claim of registry that is denied by the nation whose registry is claimed; (B) a vessel aboard which the master or individual in charge fails, on request of an officer of the United States authorized to enforce applicable provisions of United States law, to make a claim of nationality or registry for that vessel; (C) a vessel aboard which the master or individual in charge makes a claim of registry and for which the claimed nation of

3

committed;" or (b) "during the commission of such activity, a national of the United States is seized, threatened, injured, or killed;" or (2) "in the case of any vessel, if such activity is committed in an attempt to compel the United States to do or abstain from doing any act." 18 U.S.C. § 2280a(b).

Pursuant to 18 U.S.C. § 2237(a)(2)(B), it is unlawful for "any person on board a vessel of the United States, or a vessel subject to the jurisdiction of the United States,[7] to—[] provide materially false information to a Federal law enforcement officer[8] during a boarding of a vessel regarding the vessel's destination, origin, ownership, registration, nationality, cargo, or crew." 18 U.S.C. § 2237(a)(2)(B).

In light of what the remaining crewmembers saw, heard, experienced, and learned while around the four defendants, the Court also signed arrest warrants for ten material witnesses pursuant to 18 U.S.C. § 3144: Zulfiqar, Usman Omar, Umar Farooq, Musawir Ahmad, Muhmad Bilal Zafar, Mohammed Asif, Mehandi Hassan, Muhammad Rashid, Muhammad Kashif, and Muhammad Aslam Hyder.

The following week, the Federal Bureau of Investigation (FBI) placed all fourteen crewmembers under arrest and ultimately transported them from overseas to Richmond,

---

registry does not affirmatively and unequivocally assert that the vessel is of its nationality; and (D) a vessel aboard which no individual, on request of an officer of the United States authorized to enforce applicable provisions of United States law, claims to be the master or is identified as the individual in charge, and that has no other claim of nationality or registry under paragraph (1) or (2) of subsection (e)." 46 U.S.C. § 70502(d)(1).

[7] A "vessel subject to the jurisdiction of the United States" has the same definition as discussed in 18 U.S.C. § 2280a.

[8] "Federal law enforcement officer" "means any officer, agent, or employee of the United States authorized by law or by a Government agency to engage in or supervise the prevention, detection, investigation, or prosecution of any violation of Federal criminal law." 18 U.S.C. § 2237(e)(1); 18 U.S.C. § 115(c).

Virginia.

Across February 22 and 23, 2024, thirteen of the fourteen crewmembers—including all four defendants—were presented to a United States Magistrate Judge for their initial appearances. The fourteenth crewmember, a material witness, is scheduled to be presented for his initial appearance on February 26, 2024. The Court scheduled preliminary hearings and detention hearings for the four defendants and detention hearings for the ten material witnesses across the week of February 26, 2024.

**Factual Background[9]**

***Iranian-Backed Houthi Rebel Force Attacks***

Beginning in around October 2023 after the October 7 Hamas attack on Israel, Houthi rebel forces,[10] previously designated as a foreign terrorist organization by the United States Department of State until February 2021, have engaged in a number of attacks using missiles and associated navigation systems on United States interests and other vessels.

Beginning in and around mid-October 2023, for example, Houthi rebel forces began launching attacks against Israeli interests in an alleged effort to stop Israel's military efforts against Hamas forces in and around Gaza. The *USS Carney*, an American military vessel in the area of operation, appears to have shot down a number of Houthi missiles and drones launched in the direction of Israel.

---

[9] The government hereby incorporates by reference the factual background concerning the Hamas terrorist attack on Israel on October 7, 2023, the Iranian support of Hamas, and the Islamic Revolutionary Guard Corp.

[10] Houthi rebel forces, also known as "Ansarallah," were designated by the United States Department of State as a foreign terrorist organization in January 2021. In February 2021, the Houthis were dedesignated as a foreign terrorist organization. On January 17, 2024, the United States Department of State designated the Houthis as a Specially Designated Global Terrorist group, set to take effect on February 16, 2024.

On or around November 8, 2023, Houthi rebel forces shot down an American MQ-9 Reaper drone, claiming that the drone was operating in the area off the coast of Yemen.

On November 19, 2023, Houthi rebel forces, using a helicopter, attacked and captured the *Galaxy Leader*, an Israeli-owned cargo ship in the Red Sea, and brought the ship and its crewmembers to a port off the coast of Yemen.  The Houthis released video of their attack and capture of the *Galaxy Leader*.[11]

On November 29, 2023, the *USS Carney* was operating in the Red Sea and shot down an Iranian-produced KAS-04 unmanned aerial vehicle launched from Houthi-controlled areas of Yemen.  The UAV was heading toward the warship.  At the time of the shoot down, the *USS Carney* was escorting the USNS SUPPLY (Oiler) and another U.S. flagged and crewed ship carrying military equipment to the region.

On December 3, 2023, there were four attacks against three separate commercial vessels operating in international waters in the southern Red Sea.  These three vessels were connected to 14 separate nations.  The *USS Carney* responded to the distress calls from the ships and provided assistance.  According to United States Central Command, "We also have every reason to believe that these attacks, while launched by the Houthis in Yemen, are fully enabled by Iran."  Specifically, United States Central Command reported as follows:

- "At approximately 9:15 a.m. Sanaa time, the *USS Carney* detected an anti-ship ballistic missile attack fired from Houthi controlled areas of Yemen toward the M/V UNITY EXPLORER, impacting in the vicinity of the vessel.  UNITY EXPLORER is a Bahamas flagged, U.K. owned and operated, bulk cargo ship crewed by sailors from two nations.

---

[11] *See* https://www.youtube.com/watch?v=-MJwZ4CRYzs.

6

The *USS Carney* was conducting a patrol in the Red Sea and detected the attack on the UNITY EXPLORER."

- "At approximately 12 p.m., and while in international waters, the *USS Carney* engaged and shot down a UAV launched from Houthi controlled areas in Yemen.  The drone was headed toward the *USS Carney* although its specific target is not clear."

- "At approximately 12:35 p.m., UNITY EXPLORER reported they were struck by a missile fired from Houthi controlled areas in Yemen.  The *USS Carney* responded to the distress call.  While assisting with the damage assessment, the *USS Carney* detected another inbound UAV, destroying the drone with no damage or injuries on the *USS Carney* or UNITY EXPLORER."

- "At approximately 3:30 p.m. the M/V NUMBER 9 was struck by a missile fired from Houthi controlled areas in Yemen while operating international shipping lanes in the Red Sea.  The Panamanian flagged, Bermuda and U.K. owned and operated, bulk carrier reported damage and no casualties."

- "At approximately 4:30 p.m., the M/V SOPHIE II, sent a distress call stating they were struck by a missile.  The *USS Carney* again responded to the distress call and reported no significant damage.  While en route to render support, the *USS Carney* shot down a UAV headed in its direction.  SOPHIE II is a Panamanian flagged bulk carrier, crewed by sailors from eight countries."

According to open-source reporting, after these December attacks, "Ali al-Qahoum, a member of the Houthi's Ansarullah politburo," stated in an interview with Lebanon-based Al Mayadeen TV: "The Houthis will not abandon the Palestinian cause, regardless of any United States, Israeli or Western threats."

On January 12, 2024, United States Central Command forces, in coordination with the United Kingdom, and support from Australia, Canada, the Netherlands, and Bahrain conducted joint strikes on Houthi targets to degrade their capability to continue their illegal and reckless attacks on U.S. and international vessels and commercial shipping in the Red Sea. This multinational action targeted radar systems, air defense systems, and storage and launch sites for one way attack unmanned aerial systems, cruise missiles, and ballistic missiles. At the time of these first United States strikes on Houthi rebel forces, Central Command publicly reported that, "[s]ince Oct. 17, 2023, Iranian-backed Houthi militants have attempted to attack and harass 27 ships in international shipping lanes. These illegal incidents include attacks that have employed anti-ship ballistic missiles, unmanned aerial vehicles and cruise missiles in the Red Sea and the Gulf of Aden."

On January 13, 2024, United States Central Command publicly reported that "U.S. forces conducted a strike against a Houthi radar site in Yemen. This strike was conducted by the USS Carney (DDG 64) using Tomahawk Land Attack Missiles and was a follow-on action on a specific military target associated with strikes taken on Jan. 12 designed to degrade the Houthi's ability to attack maritime vessels, including commercial vessels."

Based on open-source reporting, during the week of January 14, 2024, "Houthi military spokesman Brig. Gen. Yahya Saree" claimed another missile attack on a United States-owned ship in a recorded television address and stated, "The Yemeni armed forces consider all American and British ships and warships participating in the aggression against our country as hostile targets."

### *January 11, 2024 Interdiction*

On the night of January 11, 2024, United States Central Command Navy forces, including United States Navy SEALs, as well as members of the United States Coast Guard

Maritime Safety and Security Team ("MSST") (together with the Navy personnel, the "Boarding Team"), operating from the *USS Lewis B. Puller* and conducting an authorized flag verification,[12] boarded a dhow off the coast of Somalia.[13]

According to United States Central Command, "U.S. Navy SEALs operating from USS Lewis B. Puller, supported by helicopters and unmanned aerial vehicles ('UAVs'), executed a complex boarding of the dhow near the coast of Somalia in international waters of the Arabian Sea." The boarded dhow is depicted in the photograph below.



*Dhow as of on or about January 11, 2024*

Once on board, military personnel verified that the dhow did not, in fact, have any flag, in violation of international law. As a result, the dhow qualifies as a "vessel without nationality,"

---

[12] Flag verification is when authorized personnel board a ship to verify that the ship has the authority to fly its flag or to determine the nationality of a vessel not flying a flag.

[13] The members of the Coast Guard's MSST are Federal law enforcement officers as that term is used in 18 U.S.C. § 2237(a)(2)(B).

which is subject to the jurisdiction of the United States as that term is used in 18 U.S.C. § 2237. Similarly, because the dhow was operating in international waters, it qualifies as a "covered ship" and a "vessel without nationality," which is subject to the jurisdiction of the United States as that term is used in 18 U.S.C. § 2280a.

### *Suspected Iranian Advanced Conventional Weaponry on the Dhow*

During a search of the dhow, the Boarding Team ultimately located and seized what is believed to be Iranian-made advanced conventional weaponry. Preliminary analysis of the advanced conventional weaponry indicates that it includes critical components for medium range ballistic missiles ("MRBM") and anti-ship cruise missiles ("ASCM"), to include a warhead, and propulsion and guidance components.

The weaponry and warhead are shown in the photographs below. By way of reference, in the first picture, the warhead (located in the bottom left of the photo) is shown on top of a wooden pallet, which is approximately 3.5 feet by 4 feet.



*Suspected Iranian advanced conventional weaponry discovered on the dhow*



*The warhead discovered on the dhow*

Notably, this type of weaponry is consistent with weaponry used by the Houthi rebel forces in recent attacks on merchant ships and United States military ships in the region. According to United States Central Command, "Initial analysis indicates these same weapons have been employed by the Houthis to threaten and attack innocent mariners on international merchant ships transiting in the Red Sea. This is the first seizure of lethal, Iranian-supplied advanced conventional weapons to the Houthis since the beginning of Houthi attacks against merchant ships in November 2023. The interdiction also constitutes the first seizure of advanced Iranian-manufactured ballistic missile and cruise missile components by the U.S. Navy since November 2019. The direct or indirect supply, sale, or transfer of weapons to the Houthis in Yemen violates U.N. Security Resolution 2216 and international law."

Navy forces discovered this suspected Iranian advanced conventional weaponry packaged without markings, labels, or identification in compartments near the front of the dhow. As shown below, much or all of the weaponry was concealed inside tubing or among buoys.





*Suspected Iranian advanced conventional weaponry as discovered by Navy forces*

The military's belief that the weapons are Iranian is based in part on labels on various components, the recovery of similar exploded or destroyed missiles and destructive devices from other Houthi attacks in the region around the time of the seizure, and comparison of seized weapons to known information about Iranian manufactured missiles and rockets.

### Death of Two Navy SEALs Boarding the Dhow

While Navy SEALs were initially boarding the dhow, one SEAL fell into the water in the process of boarding. Another SEAL, following protocol, jumped into the waters after the first SEAL in a rescue attempt. The Navy proceeded to conduct an extensive search to locate and rescue each SEAL. On January 22, 2024, the Navy declared both SEALs deceased.

The remaining SEALs and naval forces who successfully boarded the dhow located the material believed to be Iranian weaponry and encountered fourteen individuals on board. Navy forces ultimately determined the dhow was unsafe and unseaworthy and sunk the dhow according to protocol.

### Pahlawan's Conduct During the Navy's Boarding

Some of the crewmembers notified him Pahlawan that the Navy was approaching the dhow. Rather than turn the engine off, however, Pahlawan told crewmembers not to stop the dhow while the Navy was approaching. In fact, Pahlawan tried to make the dhow go faster. Finally, another crewmember, not Pahlawan, stepped up to the engine and stopped the boat.

During this boarding process, Pahlawan became very agitated and shouted for the crew to burn the boat before the Navy could board it.

### Boarding Team Interviews and Defendants' Materially False Statements

During the boarding process, members of the Coast Guard's MSST, through an interpreter, interviewed the mariners about the dhow, their roles on the dhow, operation of the dhow, and the cargo.

*Pahlawan's Materially False Statements*

Pahlawan was one of the mariners on the dhow when the Boarding Team boarded.  A Pakistani identification card with Pahlawan's name and photograph was found on the dhow.

During the boarding process, members of the Coast Guard's MSST, asked Pahlawan, through an interpreter, about, among other things, his role on the dhow and the cargo on the dhow.  In response, Pahlawan made the following materially false statements.

First, Pahlawan identified himself as the engineer on the dhow.  As discussed below, almost all of the mariners identified Pahlawan as the captain of the dhow in subsequent interviews with the FBI.

Second, similar to Mazhar, Pahlawan stated that the real "captain" got off of the dhow before the Navy boarded the dhow.  In addition to most of the other mariners describing Pahlawan as the captain, Pahlawan's statement is at odds with his subsequent interview, where he explained that the real "captain" never got onboard the dhow.

Third, Pahlawan stated that he was not aware of any cargo on the dhow.  As discussed below, there is probable cause to believe that Pahlawan was aware of the weapons on the dhow.

These false statements were material to the Coast Guard's MSST because they influenced the Coast Guard's understanding of who was in charge of the dhow and the cargo on the dhow.

*Mazhar's Materially False Statements*

Mazhar was one of the mariners on the dhow when the Boarding Team boarded.  A Pakistani identification card with Mazhar's name and photograph was found on the dhow.

In response, Mazhar made the following materially false statements.

First, Mazhar stated that, while the real "captain" had been on the dhow when the dhow was underway, the "captain" had to leave the dhow to assist another vessel that was breaking down.  In contrast, and as discussed below, almost all of the other mariners identified Pahlawan as the captain of the dhow in subsequent interviews.

Second, Mazhar explained that another vessel pulled alongside the dhow while the dhow was underway, and this purported "captain" got onto the other vessel.   Multiple other crewmembers stated in subsequent interviews that the dhow did not encounter any other vessel while it was underway.

These false statements were material to the Coast Guard's MSST because they influenced the Coast Guard's understanding of who was in charge of the dhow.

*Ullah's Materially False Statements*

Ullah was one of the mariners on the dhow when the Boarding Team boarded.  A Pakistani identification card with Ullah's name and photograph was found on the dhow.

During the boarding process, members of the Coast Guard's MSST, asked Ullah, through an interpreter, about, among other things, the crewmembers on the dhow and the cargo on the dhow.  In response, Ullah made the following materially false statements.

First, Ullah identified Pahlawan as a crewmember and said there was no captain on the dhow.  As explained below, almost all the mariners identified Pahlawan as the captain of the

dhow in subsequent interviews with the FBI. Evan Ullah admitted that Pahlawan was the captain when interviewed by the FBI.

Second, Ullah stated that the dhow had come from Pakistan. During subsequent interviews, the other mariners said that the dhow came from Iran. In a subsequent interview with the FBI, Ullah changed his story and admitted that the dhow came from Iran.

These false statements were material to the Coast Guard's MSST because they influenced the Coast Guard's understanding of who was in charge of the dhow and the origin of the dhow.

*Muhammad's Materially False Statement*

Muhammad was one of the mariners on the dhow when the Boarding Team boarded. A Pakistani identification card with Muhammad's name and photograph was found on the dhow.

During the boarding process, members of the Coast Guard's MSST, asked Muhammad, through an interpreter, about, among other things, the crewmembers on the dhow and the cargo on the dhow. In response, Muhammad made the following materially false statement.

Muhammad stated that he was unaware of any cargo on board the dhow. Based on the size and location of the weaponry found on the dhow and, as explained below, a voice message to Muhammad on the day the dhow left Iran asking whether the "stuff was loaded," there is probable cause to believe that Muhammad knew about the weaponry aboard the dhow.

This false statement was material to the Coast Guard's MSST because it influenced the Coast Guard's understanding of the cargo on the dhow.

### *Subsequent Interviews of the Defendants and the Other Mariners*

Following the Navy seizure, the fourteen crew members from the dhow were transferred onto the *USS Lewis B Puller*. The FBI and NCIS subsequently conducted *Mirandized* interviews

of the fourteen crewmembers.   The information in this section stems, in part, from these interviews.

*Pahalwan's Communications and Coordination with an Affiliate of a Foreign Terrorist Organization*

Prior to departing on the dhow, Pahlawan stated that he had been in Iran for approximately two years.  He said that he began working on the dhow about 10-15 days prior to its departure.

Pahlawan said that the dhow left Konarak, Iran approximately six days prior to being boarded by the U.S. Navy.  By point of reference, the U.S. Navy boarded the dhow off the coast of Somalia in the Arabian Sea, meaning that, according to Pahlawan, the dhow had travelled from the southern coast of Iran towards Somalia.

Pahlawan said that before the dhow left Iran, it was inspected by the Iranian Navy about one hour before departure.  Pahlawan said that an individual whom he identified as the "owner" of the dhow, along with another individual he claimed was the "captain" of the dhow were at the inspection.

According to Pahlawan, the "captain" gave him a heading for the dhow and told Pahlawan that he would meet Pahlawan after a few days at sea.  As a result, neither the "captain" nor the "owner" were on the dhow when it was boarded by the U.S. Navy.

Pahlawan initially advised the agents that he was given a satellite telephone by the "owner" of the dhow, whom he also described as his employer, located in Iran, who Pahlawan knew as an Iranian national whom he identified by first and last name.  Pahlawan later stated the satellite telephone was already on board the dhow when Pahlawan boarded.  Pahlawan stated he would only receive calls on the satellite telephone from the "owner," who would ask Pahlawan for periodic updates on the vessel's location.

Pahlawan said that he had only received two such calls in the six days that the dhow had been at sea. FBI agents' physical analysis of the satellite telephone showed that Pahlawan received at least four calls from that individual during the days that the dhow was at sea, including one call on the day of the interdiction. The calls lasted between about a minute to over two-and-a-half minutes. Further, there were two calls from the satellite phone to the telephone number for the "owner" on the day of the interdiction. Those calls were not picked up by the "owner."

FBI analysis of the telephone number on the above-referenced incoming calls identified the caller as a known Iranian, with the same first name that Pahlawan provided. FBI assesses this individual to be affiliated with a designated foreign terrorist organization involved in smuggling activity. FBI assesses this individual to be affiliated with the Islamic Revolutionary Guard Corps. FBI analysis of Pahlawan's personal cellular telephone revealed this same telephone number saved in his contact list by the individual's first name only.

Based on my training and experience, I understand that the Iranian government uses non-military vessels, such as the dhow, to smuggle weaponry to other countries, such as to Yemen. Specifically, I know that it is common for weapons smugglers to travel from Iran to Somalia, and then to conduct a ship-to-ship transfer of the weapons. The second ship then travels from the coast of Somalia to the Houthis in Yemen.

In my training and experience, Pahlawan's purported route for the dhow, traveling from Iran to Somalia, is consistent with other weapons smuggling operations.

*Identification of Pahlawan as the person in charge of the dhow*

Most of the crewmembers identified the boat's captain as an individual later determined to be the defendant, Muhammad Pahlawan.

18

While the crewmembers were together on the dhow or waiting to be interviewed, Pahlawan told the other crewmembers not to identify him as the captain to the FBI, but rather, to say that he was the refrigeration mechanic for the boat.

Pahlawan was interviewed twice by the FBI and NCIS. In both interviews he denied being the captain of the boat, though he did ultimately admit that he was the person who was nominally "in charge" of the dhow because he was the senior sailor on-board since the actual captain had not arrived on the boat. Pahlawan also explained that he had experience working on at least two other dhows from Iran. He said based on his age and his position as the refrigeration mechanic, he held a respected role within the hierarchy on-board. Multiple crewmembers said that Pahlawan gave them directions on how and where to steer the dhow.

In a preliminary review of Pahlawan's cell phone, law enforcement agents found a message dated October 13, 2023, from Pahlawan to a woman on Facebook Messenger, wherein PAHLAWAN said, "I am a fish shep [sic] captain." During the interview, Pahlawan also referred to the dhow as "my launch," which, according to the translator, is a reference to a boat.

*Pahlawan, Mazhar, and Muhammad's statements regarding the weaponry on the dhow*

Pahlawan denied in both interviews knowing that the military equipment was located on the dhow. He and the other crewmembers all claimed that they were merely out on the dhow fishing. There were no fish found on the vessel, and the crewmembers said that they had not fished. Pahlawan said that he was waiting to get to warmer waters.

Pahlawan indicated that he would have thrown illegal cargo overboard if he had known about it. But he also said that he would have personally inspected any cargo that he knew was on the dhow.

Pahlawan also confirmed that, in addition to Facebook, he had Snapchat, Instagram, and TikTok (purportedly for his son). In my training and experience, information about the war in Israel, the Houthis' attacks on United States' ships in the region, to include both U.S. military and commercial ships (and the Houthis' reasons for conducting such attacks), and Iran's support of the Houthis (and Iran's reasons for doing so), are widely publicized on social media platforms such as Facebook, Snapchat, Instagram, and TikTok. This is especially true because of the multiple public announcements from the Houthis, Hamas, and Iran—and the subsequent news coverage of those announcements—some of which are discussed within this affidavit.

Further, during his interview, Pahlawan said that he was upset that a Houthi missile could potentially be shot at his Sunni brothers elsewhere in the Middle East.

Mazhar, for his part, denied seeing the weaponry on the dhow or the packaging that the weaponry was in. Notably, at least one other mariner stated that Mazhar was one of the few mariners who went below deck.

Finally, Muhammad initially told members of the Coast Guard MMST during the boarding that he was unaware of any cargo on the dhow. Further, during his interviews with the FBI, Muhammad stated that he did not see anyone load anything onto the dhow and did not participate in loading anything onto the dhow.

An initial review of Muhammad's cellphone shows that on January 5, 2024—near the time the dhow left Iran— Muhammad received a voice message asking if "the stuff was loaded." In response, Muhammad said, "Yes, and we're leaving Chah Bahar."

Notably, one of the other mariners explained that the dhow was located in Konarak, Iran the night before the mariners left, but that the dhow was taken to Chah Bahar to get diesel fuel that night. Chah Bahar is a town on the other side of the Chabahar Bay from Konarak, Iran.

Based on public source reporting from the United States Navy Office of Naval Intelligence, the Islamic Republic of Iran Navy operates a naval base in Chah Bahar.

In an interview with the FBI, Muhammad initially stated that he could not recall why he was talking to the individual who asked him if "the stuff was loaded." Muhammad then said that he was communicating with someone he described as a secretary who records the amount of fish caught on fishing trips. The "stuff" referred to in the message, according to Muhammad, was purportedly about fish that Muhammad and a friend had caught the day before.

### Continued Houthi Rebel Force Attacks

According to multiple reports from United States Central Command and other authorities and open-source materials, Houthi rebel forces have continued to use weaponry similar to that seized on the dhow on January 11, 2024. These attacks have continued to as recently as January 24, 2024. Below are specific details of those Houthi rebel forces attacks based on Department of Defense and open-source information.

On January 14, 2024, an anti-ship cruise missile was fired from Iranian-backed Houthi-controlled areas of Yemen toward *USS Laboon*, which was operating in the Southern Red Sea. The missile was shot down in the vicinity of the coast of Hudaydah by U.S. fighter aircraft.

On January 15, 2024, Iranian-backed Houthi rebel forces fired an anti-ship ballistic missile from Houthi-controlled areas of Yemen and struck the *M/V Gibraltar Eagle*, a Marshall Islands-flagged, U.S.-owned and operated container ship. And, earlier that same day, U.S. Forces detected an anti-ship ballistic missile fired toward the Southern Red Sea commercial shipping lanes. The missile failed in flight and impacted on land in Yemen.

On January 17, 2024, an assessed one-way attack UAS was launched from Houthi-controlled areas in Yemen and struck *M/V Genco Picardy* in the Gulf of Aden. *M/V Genco Picardy* is a Marshall Islands flagged, U.S. owned and operated bulk carrier ship.

On January 18, 2024, Iranian-backed Houthi rebel forces launched two anti-ship ballistic missiles at *M/V Chem Ranger*, a Marshall Island-flagged, U.S.-Owned, Greek-operated tanker ship. The crew observed the missiles impact the water near the ship.

And, as recently as January 24, 2024, Iranian-backed Houthi rebel forces fired three anti-ship ballistic missiles from Houthi-controlled areas of Yemen toward the U.S.-flagged, owned, and operated container ship *M/V Maersk Detroit*, transiting the Gulf of Aden. One missile impacted in the sea. The two other missiles were successfully engaged and shot down by the *USS Gravely*.

On January 17, 2024, The United States Department of State designated the Houthis rebel forces as a Specially Designated Global Terrorist group. According to the Department of State, "[s]ince November, the Houthis have launched unprecedented attacks against international maritime vessels in the Red Sea and Gulf of Aden, as well as military forces positioned in the area to defend the safety and security of commercial shipping. These attacks against international shipping have endangered mariners, disrupted the free flow of commerce, and interfered with navigational rights and freedoms."[14]

### The Bail Reform Act of 1984 – 18 U.S.C. § 3142

Pursuant to 18 U.S.C. § 3142(a), when a defendant is arrested, the Court, in relevant part, "shall issue an order that, pending trial, the person be (1) released on personal recognizance ...; (2) released on a condition or a combination of conditions ...; or (4) detained under subsection

---

[14] *See* https://www.state.gov/terrorist-designation-of-the-houthis/.

(e)." Detaining a defendant under Section 3142(e) requires a hearing "pursuant to the provisions of subsection (f)." *Id.* at § 3142(e).  The government moves for a detention hearing for one defendant, Muhammad Pahalawan, under Section 3142(f)(1); it moves for a detention hearing for all four defendants—Muhammad Pahlawan, Mohammad Mazhar, Gufran Ullah, and Izhar Muhammad—and all ten material witnesses under Section 3142(f)(2).

According to Section 3142(f), there are limited circumstances in which the Court "shall hold a hearing to determine whether any condition or combination of conditions . . . will reasonably assure the appearance of such person as required and the safety of any other person and the community." 18 U.S.C. § 3142(f).  First, under Section 3142(f)(1), the government may move for a detention hearing in cases that involve certain enumerated circumstances such as crimes of violence, death-eligible offenses, or offenses involving the possession or use of certain dangerous items including firearms, destructive devices, or dangerous weapons. *See* 18 U.S.C. § 3142(f)(1)(A),(B), and (E).  It is this latter prong under which the government moves for detention as to Muhammad Pahalawan.  Here, his charged offense under Section 2280a involves possessing a *warhead*, which comfortably fits within the definition of "destructive device" under Section 921 as enumerated in Section 3142(f)(1)(E).  Indeed, pursuant to 18 U.S.C. § 921(a)(4), the term "destructive device" includes "any explosive, incendiary, or poison gas—(i) bomb, (ii) grenade, (iii) rocket having a propellant charge of more than four ounces, (iv) missile having an explosive or incendiary charge of more than one-quarter ounce, (v) mine, or (vi) device similar to any of the devices described in the preceding clauses."

Second, under Section 3142(f)(2), the statute makes clear the Court "shall hold a hearing … upon motion of the attorney for the government or upon the judicial officer's own motion in a case, that involves (A) a serious risk that such person will flee; or (B) a serious risk that such

person will obstruct or attempt to obstruct justice, or threaten, injure, or intimidate, a prospective witness or juror." 18 U.S.C. §3142(f)(2)(A) and (B). It is well established across various circuit courts of appeal that a defendant is eligible for a detention hearing based on a serious risk of either flight or obstruction under Section 3142(f)(2), separate and apart from any violence. "In the nearly forty years since the enactment of the Bail Reform Act, countless defendants have been detained even where the charged offense did not involve violence, based on drug charges, *see* 18 U.S.C. § 3142(f)(1)(C), being a repeat offender, see *id.* § 3142(f)(1)(D), a serious risk of obstruction of justice, see *id.* § 3142 (f)(2)(B), or a serious risk of threats to prospective witnesses or jurors, *id.*" *United States v. Hale-Cusanelli*, 3 F.4th 449, 456 (D.C. Cir. 2021). In fact, at least one court soon after the Bail Reform Act was implemented explicitly laid out the authority to hold a detention hearing under Section 3142(f)(2), along with the authority to later detain the defendant on similar grounds even absent violence:

> [S]ubsection (f)(2) gives the judicial officer or the Government the option of initiating a detention hearing in a case perceived to involve *only* a serious risk that the person will flee. § 3412(f)(2)(A). It is illogical to have that power without the correlative ability at the hearing to determine that detention is indicated on the sole basis of a finding that no conditions will assure *appearance*. Subsection (f)(2)(B) correspondingly provides for initiating such a hearing in a case that involves a serious risk of obstruction of justice or witness intimidation—a power which would make no sense if, upon hearing, the judicial officer were unable to detain based solely on a finding that no conditions will assure *safety*.

*United States v. Kouyoumdjian*, 601 F. Supp. 1506, 1509 (C.D. Cal. 1985). It is this risk of flight and obstruction inherent in Section 3142(f)(2) that the government relies on to move for detention for all four defendants and all ten material witnesses. At least one court has concluded that all the government must present is a preponderance of evidence that the subject is either a serious obstructive risk or serious flight risk under Section 3142(f)(2). *See United States v. Madoff*, 586 F. Supp. 2d 240, 247 (S.D.N.Y. 2009) (citing *United States v. Friedman*, 837 F.2d

24

48, 49 (2d Cir. 1988)). Ultimately, "[t]he decision whether to hold a hearing occurs based on even less information than a decision to detain or release: a detention order is based on a hearing, while an order to hold a hearing is based on a proffer of what the hearing might establish." *United States v. Singleton*, 182 F.3d 7, 12 (D.C. Cir. 1999).

If the Court finds a detention hearing is necessary under Section 3142(f), it then must consider enumerated factors to determine whether there are conditions of release that will reasonably assure the appearance of the person as required and the safety of any other person and the community. 18 U.S.C. § 3142(g). Those factors include the nature and circumstances of the offense charged, the weight of the evidence against the person, the history and characteristics of the person (including past conduct, history relating to drug or alcohol abuse, criminal history, and whether at the time of the offense the person was on release pending trial for any other offenses), and the nature and seriousness of the danger the person poses to any person or the community. *Id.* "For pretrial detention to be imposed on a defendant, the lack of reasonable assurance of either the defendant's appearance or the safety of others or the community, is sufficient; both are not required." *United States v. Stewart*, 19 F. App'x 46, 48–49 (4th Cir. 2001) (citing *United States v. Rueben*, 974 F.2d 580, 586 (5th Cir.1992)). "With regard to the risk of flight as a basis for detention, the government must prove by a preponderance of the evidence that no combination of conditions will reasonably assure the defendant's presence at future court proceedings." *Id.* (citing *United States v. Hazime*, 762 F.2d 34, 37 (6th Cir.1985); *see also United States v. Medina*, 775 F.2d 1398, 1402 (11th Cir.1985) (noting that, under the Act, the clear and convincing evidence standard applies only to a determination that "no condition or combination of conditions will reasonably assure the safety of any other person and the community")).

25

In certain limited circumstances, Section 3142 creates a rebuttable presumption of detention.  Indeed, "the government does not bear the burden of proof in every bail hearing.  Sections 3142(e)(2) and (3) create rebuttable presumptions for certain arrestees that 'no condition or combination of conditions will reasonably assure the safety of any other person and the community.'" *Miranda v. Garland*, 34 F.4th 338, 363 (4th Cir. 2022) (quoting 18 U.S.C. § 3142(e)(2), (3)).  "[A]rrestees face this presumption if the judicial officer finds there is probable cause to believe they committed certain drug offenses, *see id.* § 3142(e)(3)(A); committed firearms offenses, serious crimes in a foreign country, or terrorism, *see id.* § 3142(e)(3)(B);" or engaged in a "Federal crime of terrorism" under Section 2332b(g)(5)(B), *see id.* § 3142(e)(3)(C). *Id.*  The last example triggers the rebuttable presumption here: Pahlawan is charged with a "Federal crime of terrorism," as Section 2280a is an enumerated statute under 18 U.S.C. 2332b(g)(5)(B).  In this circumstance, the defendant must rebut that presumption "by coming forward with evidence to suggest that the presumption is unwarranted in his particular case, *i.e.*, satisfies his burden of production." *United States v. Fenn*, No. 1:12-CR-510, 2016 WL 1546220, at *2 (E.D. Va. Apr. 15, 2016) (citing *United States v. Boyd*, 484 F. Supp. 2d 486, 488 (E.D. Va. 2007)).  "If the defendant presents such evidence, the burden shifts back to the government to prove that detention is justified due to risk of flight or risk of future dangerousness, as described above." *Id.*

**Argument**

***Defendants (Pahlawan, Mazhar, Ullah, and Muhammad)***

The enumerated factors under Section 3142(g) all weigh in favor of pretrial detention for all four defendants.  There is clear and convincing evidence these four defendants pose a danger to the community, and there is a preponderance of evidence that they will fail to appear at future

court proceedings.

**Pahlawan.**  As detailed above, Pahlawan's charged offense under Section 2280a constitutes a "Federal crime of terrorism," triggering a rebuttable presumption that he be detained pending trial.  So, naturally, the (g) factors related to Pahlawan's offense also clearly indicate that detention is warranted.  Under Section 3142(g)(1), Congress explicitly expressed concern over the nature and circumstances of offenses that constitute a "Federal crime of terrorism" and offenses that "involve . . . [an] explosive or destructive device."  Here, Pahlawan was the captain of a sea vessel on which he was knowingly smuggling a warhead and critical components for medium range ballistic missiles and anti-ship cruise missiles across the Arabian Sea.  Under Congress's own terms, these circumstances inherently present a danger to the community.  Under Section 3142(g)(2), the weight of the evidence against Pahlawan is significant: he was the captain of a small sea vessel on which numerous, large warhead and related components were discovered; he was in possession of a satellite phone and personal phone with the name and contact information of a known affiliate of an Iranian foreign terrorist organization; the metadata on his devices shows he was, in fact, in contact with that organization; and there are numerous eye and ear witnesses that have already told law enforcement about Pahlawan's actions during the Navy's boarding process and his efforts to get witnesses to lie on his behalf.

Finally, under Section 3143(g)(3), the evidence not only demonstrates Pahlawan's danger but his obstruction and flight risk moving forward.  His "character," "family ties," "financial resources," "length of residence in the community," "community ties," and "past conduct" all weigh heavily in favor of detention.  Reflecting his lack of any ties to the community, there is an active immigration detainer lodged against the defendant, all but ensuring he will not appear for

future proceedings if he is released. Regardless, Pahalwan is someone who would *actively* not appear. From the moment the Navy attempted to board Pahlawan's vessel, he proved a risk of nonappearance—he refused to slow his boat down, attempted to burn it into the ocean, lied to investigators about the identity of the captain, and then tried to get the other crewmembers to lie by refusing to identify him as the captain. Refusing to appear for future court appearances pales in comparison to these flight and obstructive actions. If Pahlawan would have had his way during the boarding process, he would have escaped on the open sea. He should not get that chance again pending trial.

**Mazhar, Ullah, and Muhammad**. The same arguments apply to Pahlawan's co-defendants Mazhar, Ullah, and Muhammad. All three of these defendants lied to the Navy forces during the boarding process, and they lied about critical facts regarding the dangerous advanced conventional weaponry onboard. Specifically, they lied about Pahlawan's identity as the captain of the vessel (instead identifying others as the captain or describing Pahlawan as an engineer), the origin of the vessel's voyage from Iran (instead identifying Pakistan), and the cargo itself. Under Section 3142(g)(1), the nature and circumstances of these lies supports both inferences that they are a risk of danger and a risk of flight. As to danger, all three defendants were at least involved in Pahlawan's vessel operation that was carrying advanced conventional weaponry and knew enough to lie about the circumstances revolving around that operation. In fact, it appears they all accepted Pahalwan's request to lie on his behalf and carried through with it. As to flight, the greater includes the lesser: they have already proven willing to lie to armed Navy forces surrounded by a helicopter and unmanned aerial vehicle in the middle of a turbulent sea, and so the Court should take no confidence in any promises to return for future hearings. Under Section 3142(g)(2), the evidence of their dishonesty is overwhelming and diverse—coming in the form

of electronic evidence from their own devices or accounts, witness testimony from their fellow crewmembers, and witness testimony from military and civilian witnesses that interacted with them during and after the boarding. They have every incentive to flee rather than face a court of law. Finally, a number of enumerated factors under Section 3142(g)(3) weigh in favor of detention. Like Pahlawan, their "character," "family ties," "financial resources," "length of residence in the community," "community ties," and "past conduct" all reflect defendants who have not only shown they are willing to accept a co-defendant's request to lie and then lie, but also that they have no connections to the community as foreign nationals with active immigration detainers lodged against them and nothing tying them here other than this case.

### Material Witnesses (Zulfiqar, Omar, Farooq, Ahmad, Zafar, Asif, Hassan, Rashid, Kashif, Hyder)

The enumerated factors under Section 3142(g) all weigh in favor of pretrial detention for all ten material witnesses until they can be criminally deposed under Federal Rule of Criminal Procedure 15. There is a preponderance of evidence that they will fail to appear at future court proceedings. The government will be prepared to address each of the individual material witnesses and their circumstances at any detention hearings scheduled for them. That said, generally, all of them face nearly identical factual circumstances that illustrate the need for detention, including their active immigration detainers lodged against them, their complete lack of ties to the community, their complete lack of family or even acquaintance ties to the community, their complete lack of financial resources, their absence of any time in the United States let alone this community, and their being subject to unique pressures in this case as the only eye and ear witnesses to the four defendants' crimes on the vessel. As such, all ten material witnesses should be detained temporarily until the parties can complete depositions.

## Conclusion

For the foregoing reasons, the United States respectfully moves to detain the four defendants pending trial (Muhammad Pahlawan, Mohammad Mazhar, Gufran Ullah, and Izhar Muhammad) and the ten material witnesses (Zulfiqar, Usman Omar, Umar Farooq, Musawir Ahmad, Muhmad Bilal Zafar, Mohammed Asif, Mehandi Hassan, Muhammad Rashid, Muhammad Kashif, and Muhammad Aslam Hyder) pending criminal depositions.

Troy A. Edwards, Jr.
N.Y. Bar No. 5453741
Gavin R. Tisdale
John T. Gibbs
Assistant United States Attorneys
U.S. Attorney's Office, EDVA
2100 Jamieson Avenue
Alexandria, VA 22314
(703) 299-3746
Troy.edwards@usdoj.gov

Lesley Woods
Trial Attorney
National Security Division, CTS